SCOTT C. WILLIAMS (6687)
Attorney for Defendant
43 East 400 South
Salt Lake City, Utah 84lll
Telephone: (801)220-0700
Facsimile: (801) 364-3232
scwlegal@gmail.com

# UNITED STATES DISTRICT COURT
## CENTRAL DIVISION, DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>ISAIAH ELDEN KINGSTON,<br><br>        Defendant. | DEFENDANT ISAIAH KINGSTON'S REQUEST FOR RECONSIDERATION OF DETENTION<br><br>Case No. 2:18-cr-365-JNP<br><br>District Court Judge Jill N. Parrish<br>Magistrate Judge Brooke Wells |

Defendant Isaiah Kingston hereby respectfully requests that this Court reconsider his pretrial detention, and argues that basic notions of due process together with changes in circumstances and new information now available to this Court support a finding that he can and should be released on conditions that will assure his appearance and ensure that he is not a danger to the community or the criminal justice process.

## I.    DUE PROCESS CONCERNS WARRANT PRE-TRIAL RELEASE ON CONDITIONS

This Court may reopen and reconsider Mr. Isaiah Kingston's detention at any time before trial, pursuant to U.S.C. § 3142(f), as circumstances may necessitate.  *United States v.*

*Archambault*, 240 F.Supp.2d 1082, ¶6 (DSD 2002), citing *United States v. Black*, 343 F.2d 34, 37

(7th Cir. 1976).  Factors that should be considered upon reopening the detention issue include not

only the statutory factors, and factors drawn from case law applying the statute, but by due process

concerns driven by the fundamental significance of pretrial detention:

> Aside from the gateway for further review provided by §3142(f), the Court believes that the
> detention issue must also be reopened for a more fundamental reason, that being, to examine
> the due process implications of [the defendant's] continued detention.

*Archambault*, at ¶9.  The Government acknowledges this principle in its recent pleading [Doc. 114]

at page 2, citing *United States v. Cos*, 198 F. App'x 727, 732 (10th Cir. 2006) (holding that "*at some*

*point* due process may require a release from pretrial detention or, at a minimum, a fresh proceeding")

(emphasis added).

In *United States v. Salerno,* 481 U.S. 739 (1987), United States Supreme Court held that

Congress had a legitimate regulatory goal in relation to the Bail Reform Act which allowed for pretrial

detention in certain cases.  However, in the same decision, the Court acknowledged that it was

intimating "no view as to the point at which detention in a particular case might become extensively

prolonged, and therefore punitive, in relation to Congress' regulatory goal." *Id*. at 747, n.4.  The

*Archambault* decision articulated this aspect of the *Salerno* decision, at ¶¶10-11, citing many cases from

various jurisdictions which stand for the settled proposition that prolonged pre-trial detention may

become excessive and consequently punitive so as to offend due process constraints.

The District Court decision in *United States v. Vastola*, 652 F.Supp. 1446 (D.N.J. 1987)

provides an apt analogy to the present case, and involved the particular issues of how enlarging the time

before which a defendant can achieve a fair trial impacts the due process concerns of pre-trial detention.

In *Vastola* the defendants were ordered detained after their arrest, both by the magistrate judge, and

after appeal of that decision to the trial judge.  *Id*. at 1447.  The case involved numerous allegations and

2

extensive and voluminous discovery, in relation to which the parties agreed that it was "complex" pursuant to 18 U.S.C. §3161(h)(8)(B)(ii).  *Id.*  For that reason, the trial was continued to begin just over 5 months after the defendant's arrest.  *Id.*  However, three months into the detention, it became evident that, due to the nature and extensiveness of the case, the trial date was not realistic, and it would instead take closer to a total of one year to adequately prepare for a fair trial.  *Id.*  Based upon this enlargement of time, and the reasons for it (which included dilatory discovery practice on the part of the government), and despite the court's initial detention findings and the fact that the charges carried a presumption of detention, the court *sua sponte* reopened the issue of pre-trial detention.  *Id.*  The court cited to the theme "that at some point due process may require a release from pretrial detention . . . ." *Id.* citing *United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir. 1986) and *United States v. Claudio*, 806 F.2d 334 (2d Cir. 1986).  The court noted that the issue of delay is crucial due to the critical liberty interest at stake and "the grave invasion of the most fundamental of all personal liberties that occurs when preventative detention is ordered."  *Id.* at 1448, quoting *United States v. Perry*, 788 F.2d 100, 114 (3d Cir. 1986).

The present case is virtually identical to the circumstances in *Vastola*, with the exception that in the present case the Bail Reform Act places the burden on the Government overcome a presumption that Isaiah Kingston should be released on conditions:

At Isaiah Kingston's initial appearance, and the time that this Court originally denied him release, he was scheduled for trial on October 29, 2018.  That trial date was vacated at a hearing where only codefendant Lev Derman was present.  This Court ultimately *sua sponte* set a trial date for February 11, 2019.  Trial has now been continued, over Isaiah's objection, until May of 2019 based upon motion by codefendant Jacob Kingston, and on a continued finding that discovery is voluminous and the case is especially complex.  An honest consideration of the circumstances leads inexorably to the reasonable belief that further continuances of the trial will occur by no fault of

Isaiah.  The Government has repeatedly referred to an inevitable Second Superseding Indictment that will represent the true scope of the case, though it has also repeatedly pushed back the date that it expects to bring said indictment.  Even when pressed by this Court at the most recent hearing, the Government could not, or would not, give specific information of who would likely be added to the lawsuit, nor how many or what additionally charges may be added.  The Government would only say that there could be as many as four additional defendants, including a corporate defendant.  By adding a myriad of different charges and additional defendants, the Second Superseding Indictment will restart the speedy trial clock as to all defendants, beginning on the date that the last new defendant is arraigned.  Further, even in the unlikely event that the Government manages to get the indictment returned, and the various new defendants arraigned, by the end of January, it defies experience and common sense to believe that the new defendants will be able to locate and hire trial counsel in a short period of time, which counsel will then agree that they can be ready for a two-month trial to commence in May.  Additionally, the myriad of possible motions and issues that may apply to new co-defendants and new charges cannot begin to be predicted, all of which will further toll time under the Speedy Trial Act.

The Government has been, and continues to be, dilatory with regard to providing discovery.  No discovery deadline has been met, and a cache of discovery was received as recently as December 28, 2018.  The Government has also repeatedly referred to a "continuing investigation," but has provided no discovery to date that has not been in the Government's possession since early 2016.  The Government has also repeatedly indicated its intention to withhold certain discovery until just before or during trial.  Since the need to adequately review discovery, and prepare for trial in light of it, is important to a fair trial, discovery issues are likely to be the basis cited in future motions to continue trial by one or more co-defendants.  (Discovery

issues are likely to generate motions for relief from this Court, which motions will toll the speedy trial act.)

Thus, as Isaiah Kingston languishes in his fifth month of jail, no reasonable prediction can be made of when he will actually be tried, other than it seems likely it cannot reasonably occur until the latter part of 2019—over a year after his arrest and original detention.  None of this delay is in any way attributable to Isaiah Kingston.  And there was no exigency in bringing the initial indictment against him, other than to save the statute of limitations on two 2013 money laundering counts that were sexy to the Government because they involved an expensive car and an expensive house (neither of which Isaiah Kingston ever had anything whatsoever to do with).  There is absolutely no evidence that Isaiah Kingston had any intentions of leaving his family and community and fleeing in light of the WRE investigation.  The matter was old news.  In fact, counsel has confirmed from the government attorneys involved in the filter team activity that Isaiah was a cooperative party in the organization and review process, which was occurring immediately prior to his arrest.  Review of the discovery produced thus far also shows that the case is based on old news and old claims long known to Isaiah, and materials mostly seized in the well-publicized raids of February, 2016.  Further, the discovery thus far produced does not seem to be inculpatory or support the presentation made by the Government by way of hearsay at the original detention hearing.  All signs appear to support the proposition that the Government indicted Isaiah Kingston at least a half of a year before it was truly ready to begin a formal prosecution.

The Government's position in relation to the Speedy Trial Act is that all time that is tolled pursuant to §3161 provisions, is tolled as to the 90 day detention provisions at §3164.  Their argument has apparently won the day, at least thus far, and if it continues to do so, it is doubtful that any defendant will ever have an automatic right to reconsideration of detention, for virtually

*any* case activity by *any* party in the case—including the Government, who could file any manner of motion at any time—will toll time under the Speedy Trial Act.  But what is undeniable is that notions of fairness and constitutional due process overarch all considerations of detention prior to trial.  Where the period of delay becomes, as it has here, essentially indeterminable, and the reasons for the circumstance are primarily attributable to the Government, and are in no way attributable Isaiah Kingston, this Court should become increasingly concerned about giving greater weight to releasing him on conditions, even if this Court had initial concerns about doing so.

The nature and extent of delay in the case, and where the blame lies in relation to such delay, have turned a regulatory pre-trial detention into a punitive one.  The advantage gained by the Government in achieving pre-trial detention of a presumptively innocent defendant is immense: he has been stripped of his possessions—even his very clothing—and of his dignity; he has been isolated from his family and his resources; he has been isolated from his legal defense team and severely crippled in his ability to meaningfully assist in his own defense.  Such power forms the underpinnings of the bedrock constitutional principles that lead us to American law's abhorrence of the pre-trial imprisonment of presumptively innocent persons.  As stated by Justice Thurgood Marshall in his dissenting opinion in *Salerno*:

> Honoring the presumption of innocence is often difficult; sometimes we must pay substantial social costs as a result of our commitment to the values we espouse. But at the end of the day the presumption of innocence protects the innocent; the shortcuts we take with those whom we believe to be guilty injure only those wrongfully accused and, ultimately, ourselves.
> Throughout the world today there are men, women, and children interned indefinitely, awaiting trials which may never come or which may be a mockery of the word, because their government believes them to be "dangerous." Our Constitution, whose construction began two centuries ago, can shelter us forever from the evils of such unchecked power.

481 U.S. 739, 767 (1987) (Marshall, J., dissenting).

6

As this Court noted at the most recent hearing, the present circumstances of this case have resulted in a collision between continued pre-trial detention and the concepts of fundamental fairness and due process.  Isaiah Kingston respectfully requests that, in light of such considerations, as well as because he can be effectively managed on conditions of pre-trial release, his detention order be vacated, and that he be ordered released on conditions.

II.     VARIOUS OTHER FACTORS AND NEW INFORMATION SUPPORT PRE-TRIAL RELEASE ON CONDITIONS

Since this Court ordered Isaiah Kingston detained after an evidentiary hearing, new and more fully developed information has become available which sheds light on some of the factors that were apparently of concern to this Court.  Some of the information is expected to be presented in pleadings from Jacob Kingston and incorporated by reference.  Other of the information comes from materials provided in the discovery process.  Isaiah respectfully asserts that this information calls into question the strength of the Government's presentation at the time of the original detention hearings, and provides support for reconsidering Isaiah's pre-trial detention, especially in light of the burgeoning due process issues.

### New Information Does Not Support Key Detention Issues

Review of the discovery ultimately provided by the Government sheds light on whether the Government was fully candid with this Court as to certain arguments and key issues presented at the initial detention hearing.

#### Access to Money

Much was made at the original detention hearing about movement of very large sums of money during the years prior to 2016.  Large sums of that money were shown to have been sent to Turkey.  The suggestion was that Isaiah must have some claim and access to such money, since he was held out to have some ownership in WRE, and, as CFO, had a roll in causing money transfer

7

activity with signing authority on some accounts.

Nothing in the discovery so far received supports the Government's argument to this Court that Isaiah had meaningful authority over or actual personal access to any of the money, regardless of what documents might exist with his name on them.  All evidence shows that the normal CFO-type tasks that he performed were in relation to deals and activity that did not originate with or significantly involve him.  The decisions about what transactions were to occur, with what other persons or entities, for what purpose, and in what manner were made by others.  (For instance, in the lengthy probable cause statements provided in the various comprehensive search warrants that were presented to the court in 2016 Isaiah's name is never even mentioned.  Throughout the entirety of documents the name "Kingston" appears in connection only with the activity of Jacob Kingston.)  Isaiah effectuated money transfer and other activity through administering the attendant transactional and ministerial needs.  But nothing else about what he did for the company suggests any personal stake in the proceeds.  Unlike others, he did not run up charges on a company credit card.  He didn't make personal withdrawals from any accounts for personal use. He drew a salary, and lived very modestly in comparison to the company decision-makers and those with true control.  He had no authority or input regarding what money was sent where, or what was to be done with money in Turkey, etc..  This fact is also made clear by other materials received in discovery.  The vast majority of the investigation and questioning of witnesses on such topics was focused on persons other than Isaiah.  The results of the questioning pointed to persons other than Isaiah when it came to deciding how to obtain the money, what to do with money and where to put it.

A full detailed description of money transfer and investment activity is expected to be presented imminently in pleadings filed by Jacob Kingston.  Isaiah has been reliant on such a

presentation because he is unable to present the information, *since he did not and does not know about it*.  The full description by others is expected to bear this out, and demonstrate further that no money ever sent to Turkey is or was available to Isaiah.

Subsequent to 2016, the relevant companies for which Isaiah worked and their related bank accounts have become insolvent, encumbered and restricted.  There is no tenable argument that Isaiah could now access any large sum of money for any use, much less to flee his devoted family. (On or about his birthday, October 29, 2018, Isaiah received 150 birthday cards from members of his family and community.  His family and members of the community have visited him in jail daily, and have attended each of his court hearings.  These facts further bolster the important "ties to the community" consideration under the circumstances.)

<u>Connections to Turkey</u>

Much was also made at the original detention hearing about connections to Turkey, and the exotic nature of the country and its relationship with the United States.  (Since the original hearing, the issues involving the cleric have been resolved, and there is nothing to suggest that Turkey would not honor its existing extradition agreement with the United States.)  But the reality is, and it is evident from discovery materials, nothing other than his involvement in wiring money there connects Isaiah with Turkey.  Isaiah himself had nothing to do with the contacts with Turkey, including even going there.  He did not know the individuals through which his brother ultimately established Turkish relationships.  Even as CFO he had practically no contact with any such individuals. (It was learned at the detention hearing for Lev Dermen that by 2014 even Jacob Kingston was off of the accounts through which the Turkish investing was ultimately done— accounts that Isaiah never had anything to do with in the first place.)  The reality is—known to the Government through its own investigation—Isaiah has no connection to Turkey: he knows no one

related to the country, doesn't go to the county, and has no interest in the country.  (Maybe more importantly, Turkey has no interest in Isaiah.  It is incomprehensible that he could arrive there—by illegal means and as a fugitive—and Turkey would take no action against him.)

<u>Other Matters</u>

The Government relied on text messages between Jacob and an individual referred to by various pseudonyms, but is known to be Santiago Garcia.  The messages appeared to relate to a scam by Garcia to pretend to help bribe or even intimidate individuals.  A far smaller batch of text communications provided circumstantial evidence that Isaiah participated in taking money to Garcia in connection with the scam.  (There was no evidence that Isaiah knew anything specific about the activity, such that intimidation of particular individuals was discussed between Garcia and Jacob.)  At the hearing the government witness admitted that it was known that Garcia had once been on Washakie's payroll.  Over objection by the Government, it was also learned that Garcia is presently working in the capacity of an informant for the government in return for leniency in relation to criminal activity.  (It has still not been disclosed what that activity was, and what consideration Garcia is getting from the Government.  In fact none of the discovery provided thus far includes any materials, reports of information about the scam activity.)

What this court was not told, but is being developed by review of the discovery and defense investigation, is that when Garcia worked for Washakie, he routinely apparently gave money and favors and offers of real property investments to officials and politicians, including Utah Attorney General Sean Reyes.  Nor was this Court told that Garcia had/has a vendetta against the defendants because he was eventually fired for embezzling and other transgressions and falsehoods.  Further, as soon as this Court ordered the defendants detained, he embarked upon attempting to fabricate documents, make misrepresentations in court pleadings, and steal three

parcels of land not owned by him, but in relation to which Isaiah was still on record.

The Santiago Garcia text evidence used by the Government at the original detention hearing appears to have been cherry picked, out of context, and incomplete. The Government has not provided in discovery any information as to if and how Garcia prepared it, preserved it, and in what full context it was developed. They have just presented the convenient portion to this court without giving this Court the ability to assess the reliability of a source that the Government knows would be called into serious question if this Court knew of his dishonest and criminal history and motives against the defendants.

### Other Similar Prosecutions

The sort of fraud alleged in the present case is nothing unusual or unique to this case. The Government has prosecuted many other persons and corporations for the same sort of activity alleged in the present prosecution. In fact, some of the prosecutions involved activity that was alleged to have been done together with Washakie, through Jacob Kingston. The lengthy probable cause sections of the various search warrants from 2016 provide details about these prosecutions, most of which involved defendants entering into cooperation agreements with the Government, and giving interviews in connection with the agreements. As indicated *infra*, when describing the information given during the interviews, the probable cause statements do not reflect these informants indicating specific involvement of Isaiah.

Further, the nature of the information suffers from serious reliability concerns, since the defendants in the other cases were providing their information in connection with efforts to achieve leniency in relation to their admitted criminal activity. (It is noteworthy that the discovery materials provided thus far appear to contradict the statements of the incentivized informants.)

A review of the other related prosecutions also indicates that virtually no defendant in any

of the cases was detained pending trial or sentencing, even though the cases involved large sums of fraud and potentially long prison sentences.

### Health Concerns

Isaiah suffers serious and debilitating health problems due to his diagnosis of cancer, and especially his serious ulcerative colitis. This information was known to this Court at the original consideration of detention. What was not known was how ineffectively it would be treated and managed by his detention facility, and how worsening and debilitating it would become. He is not allowed to pursue the course of medication available to him prior to his incarceration, which was prescribed and was effective. His symptoms—especially his bleeding and eating challenges— have worsened daily. He has lost over 25 pounds. As his condition continues to deteriorate, counsel has become increasingly concerned that he is reaching a point where he cannot effectively participate in his defense.

## CONCLUSION

Isaiah Kingston respectfully requests that this Court reconsider its original detention order in light of the serious due process concerns and new information presented herein, together with consideration of the likely course of the case, which the Government admits is mostly going to be driven by a superseding indictment that it continues to put off. He implores this Court to demonstrate a commitment to complying with all conditions of a release, which conditions can be fashioned to ensure his appearance and lack of danger to others and the integrity of the criminal justice process. (The Pretrial Risk Assessment (PTRA) instrument described in the initial Pretrial Services Report provided to this Court indicates a 3% risk of failure to appear or have a new arrest.) Such a release is the only means of allowing Isaiah an opportunity to prepare for a full and fair trial, whenever that date should arrive in the indefinite future. It is also the only means of respecting

fundamental concepts of due process restraint on pre-trial incarceration which has become punitive due to the approach taken by the Government.

Respectfully submitted this 31st day of December, 2018.

/s/ Scott C. Williams
Scott C. Williams
Attorney for Defendant Isaiah Kingston

DELIVERY CERTIFICATE

I certify that a true and correct copy of the foregoing was caused to be delivered, through

electronic filing, to the following:

> Leslie.a.goemaat@usdoj.gov
> Richard.m.rolwing@usdoj.gov
> Arthur.j.ewenczyk@usdoj.gov
> Joen.e.sulivan@usdoj.gov

on the 31st day of December, 2018.

_____/s/ Jayme Mackay___